The mother appeals from decrees of the Juvenile Court finding her unfit and terminating her parental rights to her children, Esme and John. The father appeals from a Juvenile Court decree terminating his parental rights to John.[3] After careful consideration, we conclude that there was sufficient evidence to establish the parents' unfitness, and that termination of parental rights was proper. Also, there was no error in leaving the decision for posttermination and postadoption visitation to the discretion of the children's legal custodians. We affirm.
Background. The judge found the following facts. Esme was born in May, 2011; no father was listed on her birth certificate.[4] The Department of Children and Families (department) became involved due to concerns by hospital staff that the mother was unable to care for Esme. The mother worked with the department in learning parenting skills, and the case was closed, according to the mother, after approximately one month. Esme has attention deficit and hyperactivity disorder (ADHD), and wears braces on her legs because she walks on the tips of her toes. She has an individualized education plan to address her speech and cognitive delays.
John was born in August, 2014; he was six months old at the time of removal. He suffers from asthma and eczema, both of which are controlled by care and medication. At the time of removal, John's eczema was bleeding and cracked despite the pediatrician's treatment instructions to the mother. After placement in foster care, John was enrolled in early intervention services due to cognitive, social, and speech delays. The children do not reside in the same foster home.
The mother has cognitive delays, and has been diagnosed with ADHD and posttraumatic stress disorder. The mother completed high school but did not graduate due to her inability to pass the required standardized testing; at the time of trial she was taking classes to obtain her general education diploma. The mother has never been employed; her sole source of income is supplemental security income from the Social Security Administration.[5] The mother has complied with a majority of her department service plan tasks. Although she participated in the required psychological evaluation, she did not provide the department with the results.
The father is a level three sex offender, which designates him as a high risk of reoffense and requires that he must be supervised while in the presence of any child under the age of eighteen. This classification resulted from his 2002 convictions of the forcible rape, on multiple occasions, of his then six year old daughter, indecent assault and battery of his then eight year old niece, and the attempted kidnapping of, and assault and battery on, a fourteen year old girl who was a stranger to the father.[6] The father, like the mother, did not provide the results of the required psychological evaluation to the department. He did not participate in the required parenting assessment.
The parents met in 2010 when the mother was pregnant with Esme. She knew at that time that the father was on probation, but he did not explain why. The father later told the mother about the charge of raping his daughter, but that his daughter had lied about the allegations. He acknowledges that he lied to the mother. On October 24, 2011, the father's probation officer, during an unannounced visit, found the mother with Esme hiding in the father's apartment after the father had just reported he was alone. The probation officer informed the mother of the father's sex offender classification, but the mother believed the father's assertion that the children had lied about the allegations. Due to concerns of the father's classification, the department reopened the mother's case and continued working with the family.
In January, 2015, the father bought a multifamily home. The department approved of the following living arrangement: the mother and children lived on the first floor, the maternal grandmother and mother's brother lived on the second floor, and the father on the third floor.[7] The father was never to be alone with the children. Chain and bolt locks were on the doors of the mother's apartment to prevent the father from entering when he should not be there. The maternal grandmother agreed to supervise any visits between the father and the children anytime the mother was not present, even when the mother used the bathroom. The mother testified at trial that she would like to resume this arrangement if the children are returned to her custody. Both parents express the hope of marrying.
The incident prompting the department to remove the children occurred on February 23, 2015. On that day, the parents, the maternal grandmother, and the children drove to the pediatrician's office to treat John's "out of control" eczema. The mother brought John inside while everyone else waited in the car. The father telephoned the mother when Esme needed to use the restroom. While the maternal grandmother waited at the car, the father walked Esme approximately twenty to thirty feet along the sidewalk from the parked car to the doctor's office. The mother met the father and Esme in the building lobby, took Esme to the restroom, and returned her to the father, who walked Esme to the car.
The mother testified that the father was alone with Esme "only for three seconds," but the maternal grandmother "was watching," and the mother could see the sidewalk and parked car from the office. The father testified that he did not consider himself to be alone with Esme when he was walking her to the office. Evidence admitted at trial showed that the entrance to the doctor's office was located behind a bush. The department's filing of the underlying action was based on the father being alone with Esme while walking to and from the doctor's office, and the parents' failure to properly treat John's eczema.
In March, 2015, the department informed the mother that Esme was "acting up" and exhibiting sexualized behavior in her foster home, which the department believed to be a sign of sexual abuse. In May, 2015, Esme was moved from her foster home to an intensive foster placement due to the sexualized behavior. Two Sexual Abuse Intervention Network (SAIN) interviews were conducted as a result of comments Esme made to her social worker, Trisha Morris; Esme made no verbal disclosures in either interview.[8] When the father was mentioned during a SAIN interview, Esme started sucking her thumb and crying.
The mother does not believe the father sexually abused Esme. Instead, she believed that Esme's behavior indicated that she wanted to be with the mother and maternal grandmother. The mother informed the court investigator that she both trusted the father and was concerned that he could do the same thing to her children and that such concern kept her carefully supervising the father's access to the children. The father insisted he had never been left alone with Esme. The mother learned at trial for the first time that the charges against the father involved three girls and the details of those convictions.
The judge, in his findings after trial, expressed concerns with the mother's ongoing relationship with the father. The mother had maintained the relationship throughout the pendency of this action despite learning of the father's sex offender status, the allegations that he had sexually abused Esme (which the mother disbelieved), and knowing that her relationship with the father hindered the return of her children. The judge concluded that the mother's "continuing relationship" with the father demonstrated "her indifference towards her children, especially Esme, and her incapacity to appreciate the obligations that rest upon her as a parent." The judge also expressed concerns with the mother's ability to provide the necessary care for the children's special needs. With respect to the father, the judge expressed concerns regarding his history of sexual offenses against his own family members, the father's high risk of reoffense, and his inability "to control these unparental traits." Based on the evidence, and in considering the fourteen factors listed in G. L. c. 210, § 3 (c ), the judge concluded that both the mother and the father were currently unfit, and terminated their parental rights. Each timely appealed.
Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). In determining whether the best interests of the child are served by a termination of parental rights, we "shall consider the ability, capacity, and readiness of the child's parents ... to assume parental responsibility." Adoption of Elena, 446 Mass. 24, 31 (2006), quoting G. L. c. 210, § 3 (c ). In doing so, "[w]e give substantial deference to a judge's decision ... and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). We see no error.
a. The mother. The mother raises essentially three arguments. First, she argues that the termination was grounded in speculation about unproven sexual abuse. However, the judge did not speculate that Esme was sexually abused. The judge specifically concluded that "[n]o direct evidence that Esme was sexually abused was presented at trial." Rather, based on reports to the department of Esme's sexualized behavior, Morris's testimony of Esme's statements about "papa" kissing her "S," and Esme's nonverbal actions of sucking her thumb and crying at the mention of "papa" during a SAIN interview, the judge found there was circumstantial evidence that Esme was sexually abused. See Care & Protection of Laura, 414 Mass. 788, 793-794 (1993) (finding of sexual abuse need only be supported by preponderance of evidence); G. L. c. 233, § 83.[9] "[O]ur cases have routinely recognized a child's sexualized behavior or age- inappropriate knowledge of sexual matters as corroborative of an allegation of sexual abuse, without imposing an additional requirement that corroborative evidence corroborate the identity of the alleged perpetrator." Adoption of Olivette, 79 Mass. App. Ct. 141, 150 (2011).
The mother argues that the judge should not have admitted evidence pertaining to the reports of Esme's sexualized behavior on hearsay grounds. The judge admitted certain hearsay statements to show notice of Esme's behavior to the department and to the mother. See Albright v. Boston Scientific Corp., 90 Mass. App. Ct. 213, 222 (2016), citing Mass. G. Evid. § 801(c) note (2016). The judge admitted other hearsay statements to show Esme's state of mind when the statements were made. However, the mother failed at the close of evidence to renew her objections to the evidence of sexual abuse allegations admitted de bene during trial.[10] See Commonwealth v. Salyer, 84 Mass. App. Ct. 346, 355-356 (2013) ("The duty to strike [de bene] evidence rests with the party that objected to its admission"). As a result, those statements properly remain as evidence in this case. Id. at 355.
The mother's second argument is that the finding of the mother's current unfitness was not supported by clear and convincing evidence. We disagree. The mother's contention that some of those findings were not supported by the evidence is belied by the record and is largely based on the fact that the mother views the evidence differently from the judge.[11] The judge is not required to view the evidence from the mother's perspective. See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984).
The judge acknowledged the mother's consistent weekly visits with the children, her completion of a majority of her service plan tasks, and her ongoing work with her long-time therapist. However, there was ample evidence to support her current unfitness. The mother entered a relationship with the father without determining his complete criminal history after she knew that he was on probation. She then remained in a relationship with the father after she became aware of his complete criminal history, despite the apparent risk he posed to Esme. She knew that her ongoing relationship with the father was a barrier to the return of her children. The parents' ongoing relationship presents a high risk of sexual abuse, especially of Esme, and demonstrates the mother's indifference to the welfare of her children and her incapacity to appreciate her parental obligation to keep her children safe. See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973). The mother's failure to appreciate this obligation is an " 'appropriate and relevant' consideration in the judge's determination of the mother's fitness." Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008), quoting Care & Protection of Isabelle, 33 Mass. App. Ct. 548, 549 (1992). Additionally, the mother's lack of understanding of the significant safety risk the father poses due to his sex offender status at the very least demonstrates her incapacity and inability to act as a fit parent for the children and their particular needs. See Adoption of Elena, 446 Mass. at 31-32 ; G. L. c. 210, § 3 (c ).
Further, both children have specialized needs and the mother has cognitive limitations. Despite receiving care instructions and medicated creams to treat John's eczema, his condition worsened in the mother's care. In contrast, John's foster parents followed the same instructions, and John's eczema improved "tremendously" with only occasional flare ups. In addition, during postremoval visits, the mother needed "to be directed on what to do" with the children. "A judge properly may consider a pattern of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child, ... as well as current parental unfitness." Adoption of Elena, 446 Mass. at 33.
The mother's third argument is that the judge abused his discretion in leaving the decision about posttermination and postadoption visitation to the children's legal custodians. "Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge." Adoption of Garret, 92 Mass. App. Ct. 664, 679 (2018), quoting Youmans v. Ramos, 429 Mass. 774, 783 (1999).
By the end of trial, the children had been in the custody of the department for more than two years, and no adoptive parents had yet been identified. Although some evidence was presented disclosing the relationship between the mother and the children, there were no "compelling reason[s] requiring that a visitation order be entered in order to protect the best interests of the child[ren]."[12] Adoption of Ilona, 459 Mass. at 66, citing Adoption of Vito, 431 Mass. 550, 553 (2000). See Adoption of Rico, 453 Mass. 749, 754 (2009). After approving the department's permanency plan to recruit an adoptive home that can accommodate both children and their individual needs, the judge did not abuse his discretion in leaving the issue of posttermination and postadoption visitation to the discretion of the legal custodians to better serve the children's best interests. See Adoption of Garret, 92 Mass. App. Ct. at 679 ; Adoption of Cadence, 81 Mass. App. Ct. 162, 168 (2012).
b. The father. The father's current unfitness was supported by clear and convincing evidence.[13] Contrary to the father's argument, the judge did not rely on stale evidence, but rather, relied on the father's current status as a level three sex offender, designating him as a high risk to reoffend, and the prognostic value of his criminal history earning him this classification. See Adoption of Jacques, 82 Mass. App. Ct. at 607. Because the father targeted prepubescent victims, he "pose[s] an even higher risk of reoffense and degree of dangerousness." 803 Code Mass. Regs. § 1.33(3) (2016). In addition, as the judge noted, the father's sex offender classification allows him to be with John "only at times when Mother or someone else in the household was available to supervise."
The father adopts the mother's argument in proving her fitness, in the hope that John will be returned to her custody and that his supervised visits may continue in the future. However, because we here affirm the termination of the mother's parental rights to John, the father's argument is futile. Alternatively fashioning this argument as his proposed adoption plan is no more successful, as the judge found the department's proposed adoption plan represented the best interests of the children. See Adoption of Dora, 52 Mass. App. Ct. 472, 475 (2001), citing Adoption of Hugo, 428 Mass. 219, 226 & n.9 (1998), cert. denied, Hugo P. v. George P., 526 U.S. 1034 (1999). See also G. L. c. 210, § 3 (c ).
The judge's decision not to order posttermination and postadoption visitation between John and the father was proper. Despite acknowledgement of the consistency of the father's weekly visits, the judge found that no further evidence demonstrating a substantial bond between the father and John was presented to support an order of visitation. Cf. Adoption of Rico, 453 Mass. at 754.
Conclusion. We are satisfied, based on this record, that the department met its burden of proving the parents' unfitness by clear and convincing evidence, Adoption of Jacques, 82 Mass. App. Ct. at 606, and that the judge did not abuse his discretion (1) in determining that it is in Esme's best interests to terminate the mother's parental rights, and John's best interests to terminate the mother's and the father's parental rights, and (2) in declining to order posttermination and postadoption visitation for either parent. See Adoption of Garret, 92 Mass. App. Ct. at 679.
Decrees affirmed.

The mother is the biological parent of both children; the father is the biological parent of John. Our use of "father" in this memorandum and order refers only to John's father. Our use of "parents" in this memorandum and order refers to the mother and John's father.

At the outset of trial, Esme's putative father was identified but the mother did not acknowledge his paternity and he was never legally adjudicated. As a result, Esme's putative father did not participate in the trial, nor is he part of this appeal.

The department first became involved in the mother's life when she was a child, due to allegations that the maternal grandmother physically abused the mother, and because of the mother's poor hygiene.

Additionally, the father was the defendant in three domestic violence actions involving his former wife and daughter, resulting in the issuance of separate G. L. c. 209A abuse prevention orders.

When performing a home visit in January, 2015, Trisha Morris, the department's social worker, observed in the father's bedroom two pictures -- one of the mother when she was approximately ten to twelve years old, the other of the father's daughter at the age at which he was sexually abusing her. Morris worried that the father may be using the pictures to sexually fantasize about young girls; the department did not remove Esme at that time but remained "mindful of their concerns" with the family.

The first disclosure occurred on March 4, 2015, while Morris was transporting Esme in her car. Morris observed Esme making "kissy faces" while in the back seat; upon asking her who gives her kisses, Esme responded that "papa" (the father) gives her kisses. Esme also responded that "papa" kisses her cheeks and "S"; when asked what her "S" was, Esme, with both hands, "grabbed her crotch area and thrusted [it] forward into her hands and into the car seat restraint." A G. L. c. 119, § 51A, report (51A report) was filed by the department due to suspected sexual abuse, which led to the first SAIN interview. The second SAIN interview occurred in December, 2015, after another 51A report was filed by the department expressing an ongoing suspicion, based on Esme's behavior, that she had been sexually abused. The behavior consisted of "touching her private areas openly while looking at other people or under blankets, humping furniture, [engaging] in sexual play with her dolls, putting crayons in her underwear, and putting her leg underneath her body and rocking back and forth on her foot." After the second interview, a referral was made to the District Attorney's office regarding allegations of sexual abuse; no charges resulted.

General Laws c. 233, § 83 (a ), states, in relevant part, that "[a]ny out-of-court statements of a child under the age of ten describing any act of sexual contact performed on or with the child ... offered in an action brought under subparagraph C of section twenty-three or section twenty-four of chapter one hundred and nineteen shall be admissible; provided, however that the person to whom the statement was made, or who heard the child make the statement testifies, and the judge finds that the statement is offered as evidence of a material fact."

The mother did timely renew her objection to the admission of hearsay of unidentified utterers contained in the investigator's report; the objection was denied.

Of the 165 findings made by the judge, the mother challenges only factual findings 90 through 92, and 102 through 103.

The judge admitted, without objection, a draft report from the mother's nontestifying expert, Dr. Sacco, which contained information relating to the mother's relationship with her children. The judge did not give weight to the doctor's opinions contained in the report due to his unavailability at trial. Substantial deference is given to the fact finder to "evaluate [the] witness's credibility and to weigh the evidence." Adoption of Gillian, 63 Mass. App. Ct. 398, 403 (2005).

The father's unfitness and termination of parental rights applies only to John.