## ADOPTION OF JACQUES.[1]

No. 11-P-190.

Essex. June 5, 2012. - October 10, 2012.

Present: BERRY, SMITH, & RUBIN, JJ.

*Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Visitation rights, Care and protection. *Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights.

This court agreed to consider the merits of the claims raised by the child on appeal from a proceeding to terminate the mother's parental rights, even though those claims were directly opposed to the child's position at trial, where the child was not a losing party below. [605-606]

In a proceeding to terminate the mother's parental rights to the child and to dispense with the mother's consent to adoption, the judge did not abuse his discretion or commit a clear error of law in determining that the mother was unfit to care for the child, that her condition was not temporary, and that termination of her rights was in the best interests of the child, where the mother failed to comply sufficiently with her service plans, where the mother's visits with the child were inconsistent at times, and where the mother was unable to handle the child's special needs. [606-609] BERRY, J., dissenting.

In a proceeding to terminate the mother's parental rights to the child and to dispense with the mother's consent to adoption, the judge did not abuse his discretion in terminating the mother's rights without an adoptive resource in place. [609-610]

In a proceeding to terminate the mother's parental rights to the child and to dispense with the mother's consent to adoption, the judge did not err in concluding that the mother's unfitness was likely to continue into the indefinite future to a near certitude. [610]

In a proceeding to terminate the mother's parental rights to the child and to dispense with the mother's consent to adoption, the judge did not abuse his discretion by declining to order postadoption visitation. [610-611]

PETITION filed in the Essex County Division of the Juvenile Court Department on August 21, 2008.

The case was heard by *Joseph F. Johnston,* J.

*William Cuttle* for the mother.

*Chick Maroni* for the child.

---

[1] A pseudonym, as are all the children's names in this opinion.

*David R. Marks*, Assistant Attorney General, for Department of Children & Families.

SMITH, J. The mother and Jacques appeal from a decree of the Juvenile Court terminating the mother's parental rights to her son, Jacques. They claim that the ultimate findings were not supported by clear and convincing evidence and that the judge erred in failing to order postadoption visitation. We affirm.[2]

1. *Background.* We summarize the facts, as found by the trial judge, with additional undisputed facts from the record. Jacques was born on June 13, 2000, to the mother, who was twenty-four years old at that time.[3] The mother has one older son and one younger daughter, Andrea, neither of whom are in her custody. The older child has resided in the Dominican Republic with his paternal grandmother since 2000. Andrea, born in 2002, resides in Boston with her paternal grandmother, who has had custody of her since she was approximately three months old. The mother has regular contact with Andrea.

Jacques is an "inquisitive, bright, perceptive and likeable" child. He was nine years old at the time of trial. Jacques is a special needs child, and he has been diagnosed with attention deficit hyperactivity disorder, posttraumatic stress disorder, and enuresis. He takes several medications for these conditions.

The mother has suffered several instances of sexual abuse in her life, both when she was a child and as an adult. At trial, she testified that Jacques was the result of a rape by the putative father. After living in a domestic violence shelter for about one year, the mother and Jacques moved in with a friend of the mother's, Suzanne White.[4] In 2002, they left White's home and lived with the maternal grandmother for a short time. The mother and Jacques then moved in with the mother's boyfriend, Bruce Fox, and his mother, Rona Fox.[5] Bruce is the father of Andrea. When their relationship ended in 2004, the mother moved into her own apartment. The Department of Children and Families

---

[2] The particular facts of this case made for a difficult decision, and we respectfully acknowledge the alternate position taken by the dissent.

[3] The putative father is not listed on Jacques's birth certificate. His location is unknown.

[4] A pseudonym.

[5] Both names are pseudonyms. We use first names to avoid confusion.

(department) first became involved with the family when Jacques was two years old, after a G. L. c. 119, § 51A, report (51A report) was filed by a mandated reporter. On July 14, 2002, the mother took Jacques to the hospital, reporting that he was lethargic and had been vomiting. An examination revealed that Jacques had suffered bruising to his abdomen, buttocks, and legs. A CAT scan further revealed a pancreatic injury, for which Jacques underwent surgery.

A doctor noted that Jacques's injuries were consistent with a force type of trauma. Although Jacques suggested at the time that it was Bruce who had abused him, the department supported the allegation of neglect by an unknown perpetrator.[6] A review of Jacques's medical records at the time also revealed that he had been admitted to the hospital shortly after his birth for failure to thrive. At that time, Jacques's doctor was also concerned about the possibility of abuse or neglect. The mother testified that Jacques's abdominal injury was caused by a fall while playing outside, although she gave inconsistent accounts to the doctors about what had happened following the injury. The judge did not credit the mother's testimony. The department filed an emergency care and protection petition, and was granted custody of Jacques. Jacques was returned to his mother's care about one year later.

In 2005, the mother lost her job and her apartment. She voluntarily relinquished custody of Jacques to White, who eventually became Jacques's permanent guardian. The mother nevertheless maintained frequent contact with Jacques. While Jacques was in White's care, the department remained involved as allegations of abuse and neglect continued. Jacques disclosed to his therapist that his mother physically abused him on visits. He once returned from a visit with cuts and scrapes around his hairline, which were observed by a department investigator.[7] White continued to send Jacques on visits with the mother, even

---

[6]Jacques nodded his head affirmatively after being asked if someone had punched him, and expressed to his doctor that "dada" had hit him.

[7]The cuts and scrapes were the result of a haircut that Bruce gave Jacques while the mother was present. When asked by a department investigator why she allowed the haircut to continue when Jacques was in obvious pain, the mother replied that she did not do anything wrong and that it was just a little cut.

after learning the department was filing a 51A report against the mother.

In August, 2008, White sought to have Jacques removed from her guardianship, as she was having difficulty dealing with Jacques's behavior and because she was suffering from a chronic illness.[8] Jacques was then placed with the Shaws,[9] a family White knew through her church. Jacques stayed with the Shaws for several months, until they were no longer able to care for his special needs. The department then placed him with an intensive foster family in Lynn.

In 2006, the mother began to collect Social Security disability income due to sciatica. Rona acts as the mother's representative payee; the mother does not receive the checks herself. The mother prefers having Rona handle her financial affairs. The judge did not credit the mother's testimony that she is responsible enough to handle her own money, and that she does not know why Rona is her representative payee. In 2008, after entering another domestic violence shelter, the mother secured a government-subsidized apartment in Lynn, where she continues to reside.

The department originally developed service plans for the mother with a goal of "[p]ermanency through [r]eunification of the [f]amily." The plans, which called for weekly contact and visits with Jacques, focused on helping the mother improve her parenting skills, particularly with respect to her understanding of Jacques's special needs, and helping her to address her own mental health issues. Initially, the mother was not in compliance with many of the service plan tasks. She did not complete a parenting class, an anger management program, or a psychological evaluation. She also failed to attend individual therapy consistently[10] and failed to visit with Jacques while he resided with

---

[8]White was also the subject of a 51A report concerning neglect. An investigator spoke with individuals at Jacques's school, who reported that White stated that "she did not want Jacques, she had problems enough of her own, and if [Jacques] was placed in her car she would gather his belongings and bring him to the [department's] office." White later reported to the department that she was having difficulty managing Jacques and his daily needs.

[9]A pseudonym.

[10]In July, 2009, the mother's therapist terminated her therapy due to her sporadic attendance.

the Shaws.[11] Jacques became upset as a result of the mother's inability to visit him.

In August, 2009, due to the mother's failure to progress, and Jacques's need for stability, the department's goal changed to adoption. The mother's compliance did, however, improve over the course of time, and by the time of trial, she had a record of consistent visits with Jacques, had completed a parenting class, and was attending an anger management class. The mother had also completed the psychological evaluation that the department had requested in order to determine if she and Jacques would be able to attend family therapy, but she refused to release the results. The judge found that the mother "purposefully withheld her evaluation results in [an] effort to conceal what I can only conclude are unfavorable results." Her attendance at individual therapy also remained inconsistent.

On the basis of the above evidence, on March 22, 2010, the judge found the mother unfit to parent Jacques, and ordered that a decree issue terminating her parental rights. The judge recognized, however, that Jacques has a significant attachment to his mother and that it was in his best interest to maintain a relationship with her. Accordingly, the judge ordered posttermination visitation to continue, at the clinical discretion of the department, with a minimum of one visit per month. The judge nevertheless declined to order postadoption visitation, as he found that it would be in Jacques's best interest to continue the issue for further hearing when an adoption resource is identified by the department.

2. *Discussion.* a. *Jacques's appeal.* Before proceeding with the arguments on appeal, we begin by addressing Jacques's position on appeal. Following the issuance of the judge's decision, at a subsequent status report hearing, it came to this court's

---

[11]The mother testified that she had trouble visiting Jacques when he was with the Shaws because of the cost of traveling from Lynn to where they lived in Ipswich. The judge did not credit this testimony, as the mother provided funds to the Shaws to help them provide for Jacques, money that they were uncomfortable accepting and that she could have used to visit him more consistently.

Further, when unable to visit Jacques in Ipswich, the mother failed to call and notify him, as she was instructed to do by the department. At times during this period, the mother neglected to visit with Jacques for two to three months.

attention that the position of Jacques's appellate counsel was in direct opposition to that of his trial counsel. In particular, Jacques's appellate counsel sought reunification, whereas Jacques's trial counsel maintained her position that the mother's rights should be terminated. In response to the conflicting advocacy, the judge held an in camera meeting with Jacques to ascertain Jacques's feelings on reunification. Following that meeting, the judge reported to counsel that his decision and orders would remain the same.[12] Jacques's appellate counsel thereafter filed an appellant brief in this court.

In its brief, the department argues that Jacques has waived his arguments on appeal, as his position on appeal is directly opposed to his position at trial. Although, "[g]enerally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances[,] [s]ee *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984)," *Adoption of Mary*, 414 Mass. 705, 712 (1993), here the child was not a losing party below. Rather, his position changed when appellate counsel was appointed. Because of that unusual circumstance, we consider the merits of Jacques's claims on appeal.

b. *Clear and convincing evidence of unfitness.* To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests. *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993). *Adoption of Peggy*, 436 Mass. 690, 701, cert. denied, 537 U.S. 1020 (2002). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents . . . .' " *Adoption of Nancy*, 443 Mass. 512, 515-516 (2005), quoting from G. L. c. 210, § 3(*c*). Unless shown to be clearly erroneous, we do not disturb the judge's

---

[12]As part of our review of the record, the panel has listened to a recording of the judge's in camera interview with Jacques. We discern no abuse of discretion in the judge taking such action under the peculiar circumstances of this case.

findings, which are entitled to substantial deference. *Adoption of Don*, 435 Mass. 158, 165 (2001). See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 127-128 (1984).

In this case, the judge based his finding of unfitness on several factors. First, the mother failed to comply sufficiently with her service plans. For many months, she was either unwilling or unable to avail herself of the services offered by the department that would "help [her] reunite with, and understand [Jacques's] issues." Second, the mother's visits with Jacques were, at times, inconsistent. Perhaps more troubling, however, was her failure to simply call him when she was unable to visit. Third, the judge found the mother unfit to handle Jacques's special needs. He observed as follows:

> "[Jacques] requires parent(s) who are prepared to undertake the important responsibilities of tending and being attuned to his special needs: a task that Mother has been unable to do for an extended period and will be unable to [do] in the foreseeable future. Mother is unfit and ill-equipped to undertake the responsibility of appropriately caring for her son."

The judge lastly considered the mother's parenting of her other two children. Although she has ongoing contact with Andrea, the mother has not seen her older son for ten years. Further, at the time of trial, she had not parented Jacques for the previous five years.

The mother argues that the judge's finding of unfitness improperly relies on stale evidence and argues that her past behavior is not probative of current circumstances. We disagree. Although "stale information cannot be the basis for a finding of current parental unfitness[,] . . . [p]rior history . . . has prognostic value." *Adoption of George*, 27 Mass. App. Ct. 265, 268 (1989). Here, the mother has a longstanding pattern of neglect stemming from both her reliance on others to care for Jacques, and her repeated, admitted lack of readiness to parent him.[13] This evidence is admissible as prognostic evidence of

---

[13]When White was no longer able to care for Jacques, the mother repeatedly expressed to the department that she was not ready to parent him.

future unfitness and was within the purview of the judge to consider.[14]

The mother also challenges the judge's subsidiary findings that ignore or minimize evidence of her recent positive gains. These findings pertain primarily to the mother's compliance with her service plan. We agree that the judge may have given less attention to the mother's recent gains than they deserve. Nevertheless, the judge was entitled to consider the evidence of her recent improvements within the context of her earlier and continuing deficits. Weighing strengths against weaknesses is within the core competency of the trial judge, who has the benefit not only of the evidence, but of seeing and assessing the parents themselves. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied, 526 U.S. 1074 (1999) (judge's assessment of the credibility of witnesses and the weight of the evidence is entitled to deference). Based on the judge's findings in this instance, it is apparent that the mother's gains were offset by continuing deficits, many of which were highlighted by the mother's lack of credibility on a number of fronts.[15]

We likewise reject the mother's contention that there was insufficient evidence of a nexus between her shortcomings and her capacity to care for Jacques. The judge specifically found that the mother was unfit to undertake the responsibility of caring for Jacques's special needs. That conclusion is supported by the mother's limited understanding of his diagnoses,[16] her repeated unwillingness and procrastination in seeking services that would assist her in understanding his special needs, and the

---

[14]We do not consider evidence regarding the history of the mother's other two children in reaching this conclusion.

[15]For instance, the judge found the mother to be not credible in regard to her stated inability to visit her older son in the Dominican Republic for financial reasons. Rather, the judge found her inability to visit her son due to a lack of effort on her part. The judge likewise found not credible the mother's assertions that she can regain custody of Andrea at any time, that she was unaware of the guardianship proceedings involving White, that she does not know the reason why Rona serves as her representative payee for her Social Security disability income, and that she did not continue her education because she could not concentrate on her homework.

[16]The mother's understanding of posttraumatic stress disorder is that "kids are depressed . . . and it has to do with emotional." Her understanding of attention deficit hyperactivity disorder is that Jacques "is hyper and does not stay still."

considerable span of time since she has last parented him. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 125 ("The specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness").

Jacques further argues that the judge failed to establish a nexus between the mother's inconsistent attendance at individual therapy and her ability to parent him. To the contrary, the judge specifically found that the mother's "untreated or partially treated issues present a strong likelihood of harm to [Jacques]." The record reveals that the mother has been diagnosed with posttraumatic stress disorder, nightmares, avoidance, anxiety, and panic attacks. She does not dispute these diagnoses. Nevertheless, despite her own admission that therapy helps her stay focused and let go of the past, she neglects to attend this necessary treatment.[17]

In sum, while we appreciate that the mother has made commendable efforts and has shown concern and affection for Jacques, we conclude that the judge did not abuse his discretion or commit a clear error of law in determining that the mother is unfit, that her condition is not temporary, and that termination of her rights is in Jacques's best interests. *Adoption of Hugo*, 428 Mass. at 225.

c. *Termination without an adoptive resource in place.* The mother argues that her rights should not have been terminated even if she was unfit because she and Jacques share an emotional bond and no adoptive resource has been located. See *Adoption of Flora*, 60 Mass. App. Ct. 334, 340-342 (2004) (concern exists when terminating parental rights where there is a bond

---

[17]The child also argues that the judge's findings that the mother "never communicated her readiness for family therapy and misinformed the court regarding [the department's] request" are clearly erroneous. Regardless of the judge's finding, it is undisputed that attending family therapy was a service plan task that the mother did not complete. At first, the mother was not in compliance with attending family therapy because she and her therapist felt that she was not emotionally ready, and the mother's first social worker declined to make a referral for that reason. Later, the mother's noncompliance with this task stemmed, at least in part, from her refusal to undergo, and then release the results of, a psychological examination that would have assisted the department in determining when or if family therapy would be appropriate.

between the parent and child and adoption is unlikely). Although a factor, the absence of imminent adoption prospects does not, by itself, invalidate a decision to terminate parental rights. *Adoption of Nancy*, 443 Mass. at 516-518. There was no abuse of discretion in this case, as the judge's decision was clearly focused on Jacques's need for "permanence and stability" that the mother had failed to provide. *Id.* at 517. The judge concluded that "[Jacques] requires and deserves permanency in his young life, a place that he will know will be his forever home."

d. *Best interests determination.* Jacques further argues that even if the mother was unfit at the time of trial, her unfitness was temporary. Accordingly, he argues that termination was not in his best interests. We disagree. Although the mother had made gains by the time of trial, "we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." *Adoption of Ilona*, 459 Mass. 53, 59-60 (2011). For substantially the same reasons cited above, the judge did not err in concluding that the mother's unfitness "is likely to continue into the indefinite future to a near certitude."

e. *Postadoption visitation.* The mother and Jacques lastly argue that the judge abused his discretion by failing to order postadoption visitation where all concerned agreed that continued visitation would be in Jacques's best interests.

Recognizing "a significant attachment" between the mother and Jacques, the judge ordered continued visitation between Jacques and his mother posttermination. He noted, however, that "[a] specific order of postadoption visitation at this time may reduce the pool of potential adoptive parents and hamper the department's efforts to recruit an adoptive home for [Jacques]," and would also affect the rights of any adoptive parents once they are identified. The judge therefore declined to order postadoption visitation and continued the issue for a further hearing at such time when a preadoptive home has been identified, or by further order of the judge.

It is clear that, in fashioning his orders, the judge recognized the importance of continuing visitation, and he emphasized numerous times that his paramount concern was the best interests of Jacques. We accordingly discern no abuse of discretion. See

*Adoption of Rico*, 453 Mass. 749, 754 (2009) ("The best interests of the child are the overarching and governing concern").

*Decree affirmed.*

BERRY, J. (dissenting). Respectfully, I dissent from that part of the majority opinion that affirms the determination of parental unfitness of the mother and the decree dispensing with the mother's consent to adoption. In my opinion, the facts of this case do not support by clear and convincing evidence the unfitness determination or the decision to terminate the mother's rights.

The judge's determination of unfitness and the decree rest heavily on findings that the mother did not sufficiently comply with service plans proposed by the Department of Children and Families (department) and did not partake in full visitation with Jacques. Indeed, forty-two of the judge's ninety-eight factual findings rest on service plan and visitation issues. I believe that many of these findings "suffer from a lack of close attention to the evidence." *Adoption of Leland*, 65 Mass. App. Ct. 580, 586 (2006). See *Care & Protection of Olga*, 57 Mass. App. Ct. 821, 823 (2003).

Specifically, the trial record shows that, at the time of trial, the mother had met regularly and cooperated in the service plan with her department social workers, undertook individual therapy for a period of time and signed a release, completed a fourteen-week parenting class, and was attending an anger management program (attendance was ongoing at the time of trial).

Moreover, there is little dispute that the mother's failure to visit Jacques was limited to the period of the time when Jacques lived in Ipswich, while she lived in Lynn. The mother consistently stressed to the department her inability to pay for transportation to Ipswich from Lynn. Then, when the location of the visits was changed to the department's Lynn office, the mother visited with Jacques regularly and consistently. In fact, during the seven months leading up to trial, the mother visited with Jacques

approximately twenty-six times, missing only two visits for appropriate reasons. The judge's disregard of this point is troubling.[1]

Although the mother's adherence to all the tasks and visitation schedule outlined in her service plans was imperfect, the case law does not hold that a parent must have a complete and perfect performance of a comprehensive service plan to maintain parental rights. See, e.g., *Adoption of Katharine*, 42 Mass. App. Ct. 25 (1997) (court unwilling to dispense with biological parents' consent to adoption where both parents resisted service plans and failed to avail themselves of programs directed toward ending use of cocaine); *Adoption of Leland*, 65 Mass. App. Ct. 580 (father not proved unfit by clear and convincing evidence where compliance with service plan deemed insufficient).

Viewed in totality, I see the facts in this case as demonstrating a sincere and growing effort by the mother to correct her parental shortcomings. See *Adoption of Carlos*, 413 Mass. 339, 350 (1992) ("A judge may properly be guided by evidence demonstrating reason to believe that a parent will correct a condition or weakness"). Moreover, I do not believe the facts support the conclusion that the mother is currently "so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child," or that she exhibits " 'grievous shortcomings or handicaps' that put the child's welfare much at hazard." *Adoption of Leland*, 65 Mass. App. Ct. at 584, quoting from *Adoption of Katharine*, 42 Mass. App. Ct. at 28. Thus, I am not persuaded that it would be in Jacques's best interests to affirm the "extreme step" of irrevocably ending all legal relations with the mother. See *Adoption of Carlos*, 413 Mass. at 349.

Appellate counsel was clear and definite that Jacques opposes the decree to dispense with his mother's consent to adoption, and confirms Jacques's expressed desire to maintain parental contact with his mother. In addition, I note that, because Jacques

---

[1]The judge appears not to have fully or fairly weighed the dramatic change in visitation and instead simply discredited the mother's testimony that she was unable to pay for transportation to Ipswich. However, given the ensuing regularity of her visits when the venue was changed to Lynn, close to where the mother resided, this particular credibility finding is not well grounded.

is now twelve years old, he has the right to object to, and thereby to block, any adoption plan. G. L. c. 210, § 2.[2]

---

[2]Jacques's appellate position differs from that advanced by his counsel on the first day of trial. However, apart from that position as trial began — and references to Jacques being distressed by his mother pressing forward at trial — at virtually all other points during the course of the proceedings, Jacques's position — as on appeal — was that he wished to maintain the parental bond with the mother.