NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-824

ADOPTION OF PAIGE (and a companion case).[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Juvenile Court judge, upon petition of the Department of Children and Families (department), found two children in need of care and protection, granted permanent guardianship of one child to a kinship guardian, granted custody of the other child to the department, and terminated the parental rights of the mother pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3. On appeal, the mother claims the evidence (1) failed to support, by the requisite standard, several findings of fact and the corresponding nexus to unfitness and (2) failed to demonstrate that termination of parental rights served the best interests of her children.  She also claims the judge abused his discretion by denying posttermination contact without adequately addressing the children's bond with her.  We affirm.

---

[1] Adoption of Rose.  The children's names are pseudonyms.

Background.  At the time of the trial, the mother had two daughters, ages three and one.  The children separately came to the attention of the department through a series of reports filed under G. L. c. 119, § 51A (51A report) and substantiated (with one exception noted below) under G. L. c. 119, § 51B.

Immediately following the birth of the first child in April 2019, a 51A report alleged that the child had been born substance exposed.  Following an investigation, this report was not substantiated.  Months later, on August 5, 2019, a second 51A report alleged that the mother brought the child to the emergency room for at least the fifth time, but the child appeared healthy.  The department substantiated the report and recommended that the mother obtain mental health treatment.  On May 16, 2020, a third 51A report alleged that once again the mother brought the child to the emergency room after having taken the child to her pediatrician three times that week despite the child presenting as healthy.  During the department investigation at the hospital, the mother claimed her roommate tainted the baby's formula, and while speaking with department workers, the mother became extremely erratic, started screaming loudly, and had to be restrained by three security officers. The mother was hospitalized, and the department took emergency custody of the child.  On May 22, 2020, the department filed a care and protection petition regarding the child, and on May 29,

2

2020, the child was placed in the third-party custody of a relative.  The child has resided with that kinship family since that date, and the relative sought guardianship of the child.

On the day of the second child's birth in October 2021, a 51A report alleged that the mother tested positive for amphetamines and Suboxone.  During the ensuing investigation, the mother apologized for failing to meet with department workers and failing to return their phone calls.  She explained being afraid that the department would take away her second child as well.  The mother admitted smoking marijuana during her pregnancy, selling prescribed medications to others, maintaining unsafe and unstable housing, and failing to obtain mental health treatment.  The department submitted a care and protection petition to the Juvenile Court on October 4, 2021 with respect to the second child.  On October 8, 2021, the second child was placed with a kinship foster family.  After a move to a nonkinship home in December 2021, the child has resided with that preadoptive foster family.

Following an eight-day trial, including nine witnesses and nineteen exhibits, a Juvenile Court judge primarily found that the mother failed to acknowledge and address mental health issues, remained absent during most of the trial, acknowledged her housing was unsafe and failed to address housing instability, made unfounded claims about the health of her

3

children, failed to take medication as prescribed and sold prescribed medication, declined department referrals, and exhibited a pattern of late or missed child visits. The judge entered a decree terminating the mother's parental rights as to both children.

Discussion. "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents.'" Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Based upon these standards, we discern no error or abuse of discretion.

4

1. Unfitness. The mother first takes issue with the judge's characterization of a "possible" substance use disorder and claims that a mere possibility is not sufficient for a finding of fact and lacks any nexus to unfitness. Given the context of the judge's finding, there was no error. In his written decision, the judge referenced substance use or a possible use disorder when describing the initial 51A reports on both newborns, the background that led to the mother's current Suboxone prescription, the mother's failure to take her medication as prescribed, the mother's medical history, the mother's noncompliance with action plans that included substance use treatment, the mother's selling her prescription medication to others, and the mother's changed behavior during her trial testimony after discontinuing her medication. We also note that in her testimony, the mother repeatedly acknowledged that she was recovering from a long-term addiction to pills, sold her prescription medication to others, and used another person's prescription medication. Considering all this evidence, the judge did not equate substance use or a possible disorder with unfitness and properly considered it as "a contributing factor" to other issues. Adoption of Xarissa, 99 Mass. App. Ct. 610, 618 (2021).

The mother next contends that the evidence did not show a nexus between the mother's mental health and her parenting

5

ability.  We disagree.  The evidence, including the mother's own testimony, demonstrated that she suffered from significant mental health challenges.  For example, she testified that she had been in therapy since the age of eight or nine, she took prescribed medication for "psychosis depression" for one and one-half years after the birth of her first child, she was hospitalized in a mental health facility, and she regularly sees a psychiatrist every two weeks, a behavioral doctor every two weeks, and a therapist every other week.  Although denying any mental health condition beyond "circumstantial anxiety," the mother repeatedly sought medical care for a healthy child, brought her child to the hospital for medically unnecessary care, became extremely erratic, started screaming loudly, and had to be restrained by three security officers.  Thus, the mother's mental health directly impacted the care of a child, less than a year old, and bore directly on her "capacity to assume parental responsibility." Adoption of Frederick, 405 Mass. 1, 9 (1989).

We are not suggesting, nor did the trial judge suggest, that the mother intentionally harmed or attempted to harm her children.  To the contrary, the record shows a mother who clearly loves her children, but was beset by significant difficulties that she never fully acknowledged or addressed despite recommendations and assistance from the department to

6

help her do so.  "[T]he State's interest in protecting children from suffering harm at the hands of their parents may properly be preventive as well as remedial."  Custody of a Minor, 378 Mass. 712, 714 (1979).

As a final challenge to the unfitness determination, the mother claims that the judge's concerns about her housing and financial situation and the mother's failure to attend the entirety of the trial are insufficient to sustain the department's burden.  As the judge ruled, he "considered the evidence in the aggregate, and has not given conclusive weight to any single component standing alone."  Also, the record fully supported the judge's housing concern.  The mother continued to live with the man she believed tainted her child's formula and had no concrete plan in place to live elsewhere apart from a general aspiration to remain on waiting lists until she could move into a nicer place.  The mother even testified that she had concerns about her children being around this man.  Despite these concerns, the mother rejected other options provided by the department to leave the apartment.

We also discern no abuse of discretion based on the judge's consideration of the mother's absence from most of the trial.  See Adoption of Helga, 97 Mass. App. Ct. 521, 526 (2020) ("Even though the mother testified at trial, the judge could reasonably conclude that her failure to appear for the last two days,

7

without an adequate explanation, was evidence that she was not making efforts to be reunited with her children"); Adoption of Talik, 92 Mass. App. Ct. 367, 372 (2017) ("a trial judge has discretion to determine whether to draw an adverse inference from a parent's absence"). Although the mother claimed that her absence stemmed from emotional strain rather than a lack of desire to "fight" for her children, the judge was not obligated to credit this testimony.

2. Best interests. The mother next contends that the judge's findings do not demonstrate that termination of the mother's parental rights is in the best interests of the children, particularly when one of the children has been placed in a guardianship. The judge concluded that the children's best interests will be served by a termination decree because the mother "has failed to engage in services aimed to address her parenting deficiencies including possible substance use, mental health struggles, and housing instability." He further found that, because of the "severity of these issues and the length of time" over which the mother has failed to address them, the mother "is not able, fit, or ready to assume parental responsibility for the subject children."

As more fully set forth in the previous discussion on unfitness, the judge's conclusions are supported by the evidence, and we discern no error of law or abuse of discretion

8

regarding the best interests of the children.  See Adoption of Ilona, 459 Mass. at 59.  Additionally, the record showed the mother missed many visits with the children and was often late, and the mother acknowledged that she was unable to bond with the second child.  By contrast, the first child has a secure attachment in her current placement, and the second child appears "comforted" by being around her preadoptive family.

Contrary to the mother's contention, the prospect of a guardianship does not require a different result. "[T]ermination is in the best interests of a child when it would bring some measure of stability to the child's life."  Adoption of Xarina, 93 Mass. App. Ct. 800, 803 (2018).  Even if the goal for one child is guardianship, "termination of the mother's rights 'significantly eases the [child's] path to a stable placement.'"  Id., quoting Adoption of Willow, 433 Mass. 636, 647 (2001).  The judge here concluded that "a grant of permanent guardianship of [the first child] to [her guardian], serves her best[] interests," noting that the child has lived with the guardian since May of 2020 as well as the aforementioned secure attachment to the guardian.  "Stability in the lives of children is important, particularly in a case that has continued for a long period of time in the hope that the [parent] could and would successfully rehabilitate [herself]."  Adoption of Nancy, 443 Mass. at 517.

9

3. Posttermination contact. Finally, the mother contends that the judge abused his discretion by declining to order post-termination contact between her and the children. The judge determined that an order of visitation with the mother was not required "to serve the best interests of the children," but also that "nothing contained herein shall be deemed to preclude contact" with the children as the "guardian or adoptive parent may deem appropriate in the future." The mother argues that the judge did not adequately consider the bond the children had with her. We disagree. A "necessary condition" for a court order for posttermination visitation "is a finding, supported by the evidence, that continued contact is currently in the best interests of the child." Adoption of Vito, 431 Mass. 550, 564 (2000). The record here shows that the judge did consider whether such an order would be in the best interests of the children, and he concluded that it would not.

Given the judge's meticulous factual findings, thoughtful conclusions, and the overall purpose of using visitation to help children negotiate the path from one family to another, we discern no abuse of discretion.

Decrees affirmed.

By the Court (Neyman, Hershfang & Hodgens, JJ.[2]),

2 The panelists are listed in order of seniority.

10

                              Assistant Clerk


Entered:  May 24, 2024.