NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-947

ADOPTION OF KASEM (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge terminated the mother's parental rights regarding her two sons, Kasem and Timothy (first and second sons), and terminated the father's parental rights regarding the second son.  The father of the second son did not appeal.  On appeal, the mother and the first son contend, among other things, that the Department of Children and Families (department) failed to demonstrate, by clear and convincing evidence, that the mother was an unfit parent, and that the trial judge erred when considering posttermination and postadoption visitation.  We affirm.

Background.  The mother gave birth to three children, a first son in 2014 (by a father now deceased), a daughter in 2017

_____

[1] Adoption of Timothy.  The children's names are pseudonyms.

(by a father who was not a party in this case), and a second son in 2019 (by her husband, hereinafter, the father or the husband). In 2017, the mother and the father married and lived together with the first son and the daughter. The mother had concerns about the father's mental health, had disagreements and arguments with him, and believed that it was not safe to be with him. The father physically abused the mother.

A series of incidents brought the family to the attention of the police and the department. Specifically, in late 2017, police officers responded to the family residence because the mother and the father had been involved in an argument. The father voluntarily left the residence. About six months later, police officers returned to the residence where the mother reported that the father struck her in the face with a closed fist. After this incident, the mother allowed the father to return home after he apologized. In October 2018, the mother and the father had an argument in the residence, and the police responded. She acknowledged being afraid of the father but did not request a restraining order.

In December 2018, the department took custody of the first son and the daughter following reports of abuse. The first son presented to the hospital with a bruise above his eye and dried blood in his nose. He alleged that the father disciplined him with cold showers and held him upside down, while he screamed,

2

and caused a nosebleed. He later told a court investigator that the father "is a monster" who hit him, and that his mother also slapped him in the face. According to an affidavit of a department emergency response worker, the mother and the father admitted that the father held the first son upside down and the child suffered a nosebleed, but they attributed the incident to horseplay. The first son also told the worker that his mother slapped him in the face "when she was 'frustrated.'" Following an examination of the daughter at the hospital, medical personnel recommended additional tests to rule out internal injuries, but the mother left the hospital with the daughter against medical advice. After initiating emergency removal, the department filed a care and protection petition on behalf of both children; the first son has remained in department custody, and the daughter has been committed to the custody of her biological father following the mother's stipulation to unfitness.

While the petition was pending, the department attempted to contact the mother in September 2019 after receiving a report that a neighbor heard a baby crying all night in the family residence. The mother, having given birth to the second son weeks earlier, refused to cooperate with the department's attempt to schedule a home visit. On October 25, 2019, department workers went to the home and received no response

3

after knocking on the door.  They returned the next day and informed the mother that the department would be taking emergency custody of the second son.  Shortly thereafter, the department filed a second care and protection petition on behalf of the second son and has maintained custody of him.

Initially with a goal of reunification, the department developed a series of family action plans and monitored the mother's progress in meeting goals related to her capacity to parent the children.  On April 19, 2020, the mother sent the department's ongoing social worker an e-mail message asking him to stop contacting her.  She refused to meet with the ongoing social worker and refused home visits.  By early 2021, the department's goals for both sons ultimately changed to adoption. In August 2021, a trial commenced on the petitions seeking to terminate parental rights but was continued for mediation. After an unsuccessful mediation and further trial, on October 31, 2022, the judge ordered the entry of decrees terminating the mother's parental rights as to both sons.  The first son has lived with his paternal grandmother since January 2019, and the second son has lived with his foster mother since May 2021.

Discussion.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the

4

parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents.'" Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). "[D]issatisfaction with the judge's weighing of the evidence" is not a sufficient basis to warrant relief on appeal. Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

The judge exhaustively considered the factors set forth in G. L. c. 119, § 26, and G. L. c. 210, § 3 (c), including the best interest of the child, in making her decision. Of particular note, the judge concluded that the mother (1) failed to engage consistently to address her shortcomings, (2) refused to communicate with the department social worker, (3) presented as disruptive and combative during parenting group sessions, (4) refused to take responsibility for her role in the removal of her children, (5) failed to make positive improvement in her

5

parenting skills, (6) maintained inconsistent visitation with the children, (7) failed to accept responsibility for harm that befell the children, (8) failed to make substantial progress toward addressing her mental health issues, (9) failed to address a history of interpersonal violence, (10) lacked insight into her parental shortcomings, and (11) lacked insight into the needs of the children. We discern no error or abuse of discretion and conclude that the evidence presented support for the judge's findings and termination decision. See Adoption of Jacques, 82 Mass. App. Ct. at 606-609.

We disagree with the mother's and the first son's contention that the judge found her unfit "simply because she relies on public assistance" or lacked "adequate financial resources." This contention is at odds with the judge's comprehensive findings and conclusions as well as the judge's cautionary note that she "considered the evidence in the aggregate, and ha[d] not given conclusive weight to any single component standing alone." Furthermore, the judge did not examine the mother's financial health in a vacuum; she considered it as a factor in assessing whether the home provided by the mother constituted a "stable, continuous environment" that serves the best interests of the children. Custody of a Minor (No. 1), 377 Mass. 876, 882 (1979). The judge reasoned that the mother, who relied on government assistance for income,

6

was ambivalent about the father returning home after completing a period of incarceration, and she lacked an insight into the financial strain of managing a home as a single parent with two young children.

We also disagree with the contention that the judge failed to consider the mother's efforts to comply with the department's action plans as well as her participation in group therapy, individual therapy, and remedial programs. To the contrary, the record shows that the judge expressly found the mother "has made more positive progress towards service engagement throughout this case than [the father]. Since June 2021, she has been consistently engaged in individual therapy, per reports from her therapist, and has been engaged in parenting classes." While acknowledging that the mother engaged in services at times, the judge found that the mother ultimately did not "demonstrate a positive improvement in parenting skills as a result of her engagement in services." See Adoption of Paula, 420 Mass. 716, 730 (1995) (absent evidence that services have "appreciably improved" capacity to meet needs of children, mere participation in services does not equate with fitness).

While the mother and the first son maintain that there was no nexus between the mother's mental health issues and her ability to care for her children, the record permitted, but did not compel, such an inference. The mother suffered from a

7

variety of cognitive and mental health diagnoses, including learning disability, attention hyperactivity disorder, dyslexia, depression, anxiety, bipolar disorder, and posttraumatic stress disorder. At trial, the mother admitted she "sometimes" had difficulty understanding; she was not taking her medication around the time the children were removed from the home; she knew at the time of removal that she suffered from untreated depression, anxiety, and a bipolar disorder; she decided to start taking her medication when she developed a hope to "better" herself; her medication "[p]uts her in bed but it helps [her]"; and she had comprehension problems during the trial (despite medication and therapy). In her findings, the judge noted that the mother "has not been able to control her behavior" and was "combative, disruptive, and yelling" during various parenting classes and required individual therapy. Also, after completing these classes, the mother still lacked insight into her own responsibility for the harm that befell her children (e.g., minimizing disciplining her children as nothing more than a "little tap") as well as insight into the impact of domestic violence on the children (e.g., appearing ambivalent about abusive husband returning home and changing her testimony about whether her husband ever struck her). The mother also lacked an "understanding of her children's needs" and proved unable or unwilling to address the issues that led to the

removal of the children from her home.  Thus, the record supported a nexus between the mother's persistent cognitive and mental health issues and her capacity to assume parental responsibility.  See Adoption of Frederick, 405 Mass. 1, 9 (1989).

The mother and the first son also take issue with certain subsidiary findings by the judge regarding the mother's participation in domestic violence therapy.  We agree that the mother quite commendably engaged in domestic violence therapy, but the judge's concern centered around her "inconsistent" trial testimony related to domestic violence and future contact with her husband.  This inconsistency suggested "a level of uncertainty" regarding whether the mother would allow the father back into the lives of the children and created "serious concerns about the potential for harm to the children."  Also, despite engaging in therapy, the mother lacked "any insight into how the history of domestic abuse in the home might have impacted the children."  Thus, we do not read the judge's findings as disregarding the mother's participation in therapy or otherwise indicating that the department did not make reasonable efforts to provide such therapy.

The record does not indicate that the judge disregarded the mother's potential to regain fitness, the first son's wishes, or the adequacy of the department's permanency plan.  The judge's

view of the evidence caused her to expressly reject the possibility that "the parent's unfitness at the time of trial may be only temporary." Adoption of Carlos, 413 Mass. 339, 350 (1992). The judge concluded that the mother's unfitness "is likely to continue into the future to a near certitude" in light of many of the factors discussed above. The judge also had before her evidence of the first son's affection for his mother and his desire for his family to live together, but such views are not "decisive" or "outcome determinative" in the overall best interest analysis. See Adoption of Nancy, 443 Mass. at 518. While the department did not submit a written adoption plan, the extensive evidence at trial, including the testimony of the social worker about the first son and the adoptive parent was "sufficiently detailed to permit the judge to evaluate the type of adoptive parents and home environment proposed and consider whether the proposal is best suited to meet the specific needs of the child." Adoption of Varik, 95 Mass. App. Ct. 762, 770-771 (2019).

For the first time on appeal, the mother and the first son contend that the judge should not have considered some information contained in reports filed under G. L. c. 119, § 51A (51A reports), as well as information related to reports that were substantiated but later reversed by the department. As we read the record, the parties agreed to the trial exhibits during

10

a lobby conference and premarked them during later discussions on the record. The discussions during that lobby conference have not been preserved as part of the record before us. See Adoption of Quan, 470 Mass. 1013, (2104) (it was incumbent on appellant "to provide a record adequate for appellate review"). See also Mass. R. A. P. 8 (a), as appearing in 481 Mass. 1611 (2019) (record includes transcript of proceedings); Mass. R. A. P. 8 (c), as appearing in 481 Mass. 1611 (2019) (when transcript is unavailable, statement of evidence or proceedings may be substituted). At one point during the recorded discussions, counsel for the mother raised a concern about an exhibit, and the judge responded, "File a motion in limine." Discussion then continued with the marking of exhibits. To the extent the mother and the first son have not waived any objections, the judge's findings and conclusions comport with the limited evidentiary use of 51A reports. See Mass. G. Evid. § 1115 (2024). To the extent the mother and the first son are claiming that the department's reversal of substantiated reports precludes the judge from making her own determination of the facts based upon other admissible evidence, we disagree. "[T]he use of such evidence was not precluded by principles of collateral estoppel." Adoption of Lorna, 46 Mass. App. Ct. 134, 141 (1999). As the department concedes, the judge erred by referring to a 2017 51A report as "supported" when that

determination was later reversed after an administrative fair hearing. That erroneous finding, out of 235 findings of fact, concerned background information that led to the department's involvement and had no bearing whatsoever on the judge's legal conclusions.

Finally, we decline to remand for further consideration of posttermination or postadoption contact. As to the mother, the judge concluded that "some post-termination and post-adoption contact could be in the children's interest" provided she "conduct[s] visits in a manner that is not stressful for the children and adheres to the best practices for interacting with each child given his special needs." We discern no abuse of discretion by the judge entrusting the particulars of visitation, posttermination, to the department, and postadoption, to the adoptive parents, who have bonded with the children and have provided nurturing homes. See Adoption of Ilona, 459 Mass. at 66. As to sibling contact, the judge did in fact order the department to continue to provide the first son with sibling visitation posttermination; and we discern no error in the judge's deferral to the adoptive parents to set the parameters for such contact postadoption, especially given the

12

current ongoing visitation among the siblings.

Decrees affirmed.

By the Court (Blake, Walsh &
Hodgens, JJ.[2]),

Clerk

Entered: October 8, 2024.

---

[2] The panelists are listed in order of seniority.