NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-728

ADOPTION OF ERIK (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from the decrees of the Juvenile Court finding her unfit to parent Erik and David, terminating her parental rights, and declining to order posttermination and postadoption visitation.  We affirm.[2]

Background.  We recount the mostly undisputed facts, reserving certain details for our discussion.  The mother's first adult involvement with the Department of Children and Families (department) began in 2016 when she had her first child

---

[1] Adoption of David.  The children's names are pseudonyms.

[2] The father is identified as the legal father on Erik's birth certificate.  The father is the putative father of David, but he is not identified on the birth certificate and had not established his paternity by the time of trial; he was also working diligently on completing his action plan tasks assigned by the department.  As a result, trial proceeded as to the mother's parental rights only, and the father's trial was continued to a later date.

at eighteen years old.[3]  The mother's first child was removed from the mother's care in 2017 due to the mother's mental health challenges, unsanitary housing, and violent relationship with that child's father.  Also in 2017, the mother was psychiatrically hospitalized at least three times and diagnosed with schizophrenia.  In 2018, the mother's parental rights as to her first child were terminated.

From January 2019 until February 2020, the mother was psychiatrically hospitalized again.  Erik was born later in 2020.  With the department's support, the mother began working with a parent aide and engaging in therapy.  In September 2020, a report alleging a violent incident between the mother and the father was filed with the department.  That same month, the department was granted temporary custody of Erik, who was an infant at the time.  The mother's engagement in services subsequently decreased, and her mental health showed a general decline.

In November 2021, the mother, having had little to no prenatal care, gave birth to David at home while she waited for emergency services to arrive.  The next day, the department filed a care and protection petition and was granted temporary custody over him.

---

[3] The department was involved with the mother's family when she was a child.

The mother continues to live with severe untreated mental health issues. She denies her schizophrenia diagnosis and maintains that a doctor gave her the diagnosis "so that she could get [Supplemental Security Income]." She has experienced auditory hallucinations, racing thoughts, and anxiety.

Throughout the department's involvement, the mother was inconsistent with her engagement in services and frequently showed hostility toward her children and department staff. The mother would yell at the children. She refused to accept Erik's autism diagnosis and called him "stupid." The mother refused to take direction from staff[4] and, on one occasion, she ripped David out of a staff member's hands. The mother also struggled to maintain timeliness and consistency for her visits with the children.[5] During visits, the mother was verbally aggressive toward staff and had to be escorted out of the department's office by police and security at least three or four times.[6] The

_____

[4] On several occasions, the mother insisted on feeding David with the formula she brought to visits, despite being informed that he was prescribed a special type of formula due to digestive issues. The mother also would feed her children food that was inappropriate for their ages.

[5] Following David's removal, the judge ordered four visits per week, which took place at the mother's apartment until her behavior toward staff led to moving the visits to a common room in the building. Later, visits were reduced to weekly at the department's office.

[6] Social workers met with the mother at least five times to address her behavior during visits but the mother would respond

3

judge found that the mother's mental health placed the children at risk of abuse or neglect.

From June 2022 to May 2023, a social worker was able to conduct only two home visits with the mother due to safety concerns.[7]  Similarly, the mother only attended one of four foster care reviews, where the department discussed their assessment of the children's needs, the mother's parenting skills and abilities, and any gaps that needed to be addressed. The department conducted several family assessments and made several action plans designed to address the mother's understanding of the children's needs, her mental health challenges, and the domestic violence in her relationships.  The department was unable to confirm the mother's consistent engagement in mental health treatment and, although she completed a parenting class and a domestic violence awareness class, her parenting skills and behavior did not improve.

At the time of trial in 2023, Erik was three years old and David was twenty-one months old.  The children were placed in

_____

with defensiveness and hostility.  The mother also was provided a parent aide to assist her in visits, support her interactions with the children, and improve her parenting skills.  This service ended, however, after the mother made false allegations against the parent aide following a disagreement.

[7] The department offered office visits in lieu of home visits, but the mother would not respond to e-mails attempting to schedule those visits.

separate foster homes with families who were committed to adopting them. The mother was not present at the trial, and the judge drew the negative inference that the mother was no longer interested in parenting her children. After the trial, the judge found that the mother was unfit and her unfitness was likely to continue, and she terminated the mother's parental rights as in the best interests of both children. The judge declined to order any posttermination or postadoption visitation because she found no evidence of a bond between the mother and the children. The mother filed a timely notice of appeal.

Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Unless shown to be clearly erroneous, we do not disturb the judge's findings, which are entitled to substantial deference." Id. at 606-607.

1. Unfitness. "Because termination of a parent's rights is an 'extreme step,' . . . a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary'"

5

(citations omitted).  Adoption of Ilona, 459 Mass. 53, 59 (2011).  "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).

The mother concedes that she was unfit at the time of trial.  She argues that the department did not make reasonable efforts to reunify her with her children and that she may raise this issue for the first time on appeal.

Passing over whether the mother can raise the question of reasonable efforts for the first time on appeal, we conclude the judge did not err in finding that the department made reasonable efforts to preserve the family.  The mother does not accept her diagnosis of schizophrenia, and her mental illness hinders her ability to parent.  The department provided her a parent aide but the mother could not work with the aide.  The department provided other services to assist the mother in understanding her children's needs and to address her mental health and parenting challenges.  The mother's engagement in these services, however, was inconsistent and often hostile.  The mother refused to cooperate with the Department of Mental Health and denied her schizophrenia diagnosis.  Accordingly, we discern

no error.[8]  See Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021) ("The department's obligation to make reasonable efforts to reunify the child with the mother is contingent upon her obligation to substantially fulfill her parental responsibilities [including seeking and using appropriate services]").

2. Posttermination and postadoption visitation.  The mother argues that the judge erred and abused her discretion by finding no bond between the mother and her children and declining to order posttermination and postadoption visitation. We disagree.  During visits, the mother would yell at staff in front of the children, place the children at risk of harm by refusing to take direction from staff, yell at the children, ignore Erik and call him "stupid," refuse to accept his autism diagnosis, and on one occasion, ripped David out of the hands of staff.  There was no evidence that the children "[sought] comfort from [the] [m]other" or "engag[ed] with her in playful,

_____

[8] Similarly, because of the mother's inability to understand and address her parental shortcomings, we disagree with the mother's passing claim that there was insufficient evidence to support the judge's determination that her unfitness was not temporary.  See Adoption of Inez, 428 Mass. 717, 723 (1999) (judge may not base future fitness on "faint hope" that parent may later become fit); Adoption of Carlos, 413 Mass. 339, 350 (1992) (in determining future fitness, "[a] judge may properly be guided by evidence demonstrating reason to believe that a parent will correct a condition or weakness that currently disables the parent from serving his or her child's best interests")

nurturing ways."  The children have lived most of their lives with their preadoptive families, with whom they have bonded. See Adoption of Ilona, 459 Mass. at 63-64.  In these circumstances the judge did not abuse her discretion in declining to order visitation.[9]

Decrees affirmed.

By the Court (Henry, Shin &
    Brennan, JJ.[10]),

*Paul Little*

Clerk

Entered:  July 2, 2025.

---

[9] The mother argues that the judge's prior ratification of the department's reduction of visits from 208 per year to twelve and subsequent cessation of visits was an abuse of discretion. Because she did not raise this issue below, it is waived.  See Adoption of Norbert, 83 Mass. App. Ct. 542, 545 (2013).  In any event, we discern no error given the mother's inability to work with staff or prioritize the needs of the children.

[10] The panelists are listed in order of seniority.